# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

United States ex rel.                          :

DONALD E. HOWARD,                        :
LARRY W. WILSON,                             :
CHARLES HARRISON, and               :
MORRIS MOSS,                                    :          Civil Action No. C-1-99-285

        Relators,                                     :

        v.                                                    :

LOCKHEED MARTIN CORP.                :          Judge Susan J. Dlott
6801 Rockledge Drive                          :
Bethesda, Maryland 20817                   :

        and                                                :

AIRCRAFT ENGINEERING CORP.      :          **SECOND AMENDED AND**
15500 Texaco Avenue                          :          **CONSOLIDATED COMPLAINT**
P.O. Box 2075-8075                              :
Paramount, California 90723-3937        :

        and                                                :

HYDE GROUP LIMITED                       :          Filed **UNDER SEAL**
86 South Cobb Drive                            :          pursuant to 31 U.S.C. § 3730(b)(2)
Marietta, Georgia 30060                       :

        and                                                :

WESTPARK INDUSTRIES, INC.          :
f/k/a AEROBOTICS ENGINEERING &  :
MANUFACTURING                              :
Euless, Texas 76040                            :

        and                                                :

C.A. SPALDING COMPANY                 :
2254 East Venango Street                    :
Philadelphia, Pennsylvania 19134-2796 :

        and                                                :

TUCKER TECHNOLOGY, INC.                    :
2295 Fourth Street                          :
P.O. Box 66                                 :
Tucker, Georgia 30085-0066                  :
                                            :
    and                 :
                                            :
WEST COBB ENGINEERING &                     :
TOOL COMPANY                                :
7267 Hiram Douglasville Highway;            :
Douglasville, Georgia 30135,                :
                                            :
    and                 :
                                            :
VOTAW PRECISION                             :
TECHNOLOGIES, INC.                          :
13153 Lakeland Road                         :
Santa Fe Springs, California 90670,         :
                                            :
    and                 :
                                            :
SUMMIT AERONAUTICS GROUP                    :
f/k/a SUMMIT DESIGN &                       :
MANUFACTURING                               :
3200 Skyway Drive                           :
Helena, Montana 59602,                      :
                                            :
    Defendants.         :

## I.    INTRODUCTION

    1.    This is an action under the False Claims Act, 31 U.S.C. § 3729, *et seq.* by *qui tam* Relators Donald Howard, Larry Wilson, Charles Harrison, and Morris Moss in their own names and in the name of the United States, to recover civil penalties and damages arising from Defendants' false statements and false claims for payment for, among other things, nonconforming and substandard tooling made by the named defendants and used by defendant Lockheed Martin Corporation to manufacture and assemble either the F-22 Raptor fighter or the C-130J cargo plane for the United States. The F-22 Raptor was re-classified as the F/A-22 Raptor fighter/attack jet, and thus references to the F-22 and the F/A-22 are interchangeable.

2.     Since the early 1990s, defendants Aircraft Engineering Corporation, Hyde Group Limited, Westpark Industries, Inc. (formerly known as Aerobotics Engineering), C.A. Spalding Company, Tucker Technology, Inc., West Cobb Engineering & Tool Company, Votaw Precision Technologies, Inc., and Summit Aeronautics Group (formerly known as Summit Design & Manufacturing) have made many if not most of the tools procured by defendant Lockheed Martin Corporation in connection with the manufacture of F-22 aircraft assembled in Lockheed's Marietta, Georgia facility. Throughout that time, the defendants collectively violated the False Claims Act by overcharging the United States for those tools. As more fully described below, Lockheed either made or, more often, purchased from third-party tooling vendors (including the other named defendants) thousands of tools needed to make the F-22. On hundreds or thousands of occasions, those tools were not made in accordance with tool design and other contract specifications and thus could not serve their intended function. Tools that were not built to tool design and other contract specifications due to vendor or Lockheed error are nonconforming.

3.     Even though the tools were nonconforming, Lockheed paid its outside vendors and charged the United States the full amount for the new tools as though they had been properly made. When the tools were made by its tooling vendors, those vendors were paid, and Lockheed charged the United States for those costs despite the fact that such tools were not properly made.

4.     Lockheed concealed from the United States the nature and extent of the nonconformances in F-22 tools. Since the tools were nonconforming, Lockheed had to rework or repair them to meet tool design requirements or scrap them (without the knowledge or consent of the United States) and purchase or make entirely new tools. Lockheed improperly charged the United States for such rework, repair, or replacement, even though the United States already had paid for the tools. Knowing

- 3 -

that such charges were improper, Lockheed hid the rework, repair, and replacement costs through various schemes described more fully below.

5.    While the allegations contained herein pertain primarily to tooling for the F-22, the schemes employed by Lockheed to overcharge for F-22 tooling often resulted in false claims being submitted for C-130J tools. Matters relating to the C-130J will be identified as such.

## II.    PARTIES

6.    Relator Donald Howard is a citizen of the United States and a current employee of Lockheed. He brings this civil action for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) for the United States and himself pursuant to 31 U.S.C. § 3730(b)(1). Mr. Howard has been employed by Lockheed for approximately 35 of the last 48 years, and has held the job classification "Jig & Fixture A" at Lockheed's Marietta, Georgia manufacturing and assembly plant since approximately May 1981.

7.    Relator Larry Wilson is a citizen of the United States and a current employee of Lockheed. He brings this civil action for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) for the United States and himself pursuant to 31 U.S.C. § 3730(b)(1). Mr. Wilson has been an employee of Lockheed since 1979, and has worked as a "Tool & Die Maker A" at Lockheed's Marietta, Georgia manufacturing and assembly plant since September 1980. Relator Wilson entered the Tooling Department as a "Tool & Die Maker B" in February of 1980.

8.    Relator Charles Harrison is a citizen of the United States and a current employee of Lockheed. He brings this civil action for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) for the United States and himself pursuant to 31 U.S.C. § 3730(b)(1). Mr. Harrison began his career at Lockheed as a production helper in 1963. By 1968 he was promoted to level A in the Jig and Fixture Department. In 1984, he began to work for Tool Inspection, where he received training to be a Tool Inspector.

- 4 -

Harrison then returned to the Jig and Fixture Shop in 1988, becoming a supervisor there in 1989. In 1992, he re-entered Tool Inspection, where he has remained since then.

9.     Relator Morris Moss is a citizen of the United States and a former employee of Lockheed. He retired from Lockheed as a Tool Inspector on March 31, 2005. He brings this civil action for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) for the United States and himself pursuant to 31 U.S.C. § 3730(b)(1). Mr. Moss started with Lockheed in the Jig and Fixture Shop in 1962, but he began working for Tool Inspection in the late 1960s, during which time he became trained as a Tool Inspector.

10.     Defendant Lockheed Martin Corporation ("Lockheed") is a Maryland corporation, with its principal place of business in Bethesda, Maryland. Defendant Lockheed transacts business in the State of Ohio, and in the Southern District of Ohio, and maintains offices at 1310 Kemper Meadow Drive, Forest Park, Ohio; 10525 Chester Road, Cincinnati, Ohio; and 21 Triangle Park Drive, Cincinnati, Ohio.

11.     Defendant Aircraft Engineering Corporation's principal place of business is in Paramount, California. Aircraft Engineering was, during most or all of the period covered by this Second Amended Complaint, a subcontractor to Lockheed and a producer of tools for the F-22 program. Lockheed assigned vendor code 5601 to Aircraft Engineering.

12.     Defendant Hyde Group Limited is a United Kingdom corporation which does business in Marietta, Georgia. Hyde Group was, during most or all of the period covered by this Second Amended Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program. Hyde Group holds itself out to be "the world's largest tool design and manufacturing resource." Lockheed assigned vendor code 5603 to Hyde Group.

13.     Defendant Westpark Industries, Inc., formerly known as Aerobotics Engineering & Manufacturing, does business in Euless, Texas. Westpark Industries,

- 5 -

Inc./Aerobotics Engineering was, during most or all of the period covered by this Second Amended Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program. Lockheed assigned vendor code 5604 to Westpark Industries, Inc./Aerobotics Engineering.

14. Defendant C.A. Spalding Co.'s principal place of business is in Philadelphia, Pennsylvania. C.A. Spalding was, during most or all of the period covered by this Second Amended Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program. Lockheed assigned vendor code 5606 to C.A. Spalding.

15. Defendant Tucker Technology, Inc. ("Tucker") is a Georgia corporation with its principal place of business in Tucker, Georgia. Tucker Technology was, during most or all of the period covered by this Second Amended Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program. Lockheed assigned vendor code 5605 to Tucker Technology.

16. Defendant West Cobb Engineering & Tool Company ("West Cobb") has its principal place of business in Austell, Georgia. West Cobb was, during most or all of the period covered by this Second Amended Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program. Lockheed assigned vendor code 5621 to West Cobb.

17. Defendant Votaw Precision Technologies, Inc. ("Votaw") has its principal place of business in Santa Fe Springs, California. Votaw was, during most or all of the period covered by this Second Amended Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program. Lockheed assigned vendor code 5602 to Votaw.

18. Defendant Summit Aeronautics Group f/k/a Summit Design & Manufacturing ("Summit") has its principal place of business in Helena, Montana.

- 6 -

Summit was, during most or all of the period covered by this Second Amended and Complaint, a subcontractor hired by Lockheed to produce tools for the F-22 program.

## III.  JURISDICTION AND VENUE

19.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

20.    Jurisdiction in this action is conferred on this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. §1331, as the case arises under the laws of the United States.

21.    There was not, prior to the filing of the original Complaint in this case, any "public disclosure," as that term is defined in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), of any of the allegations or transactions upon which this action is based.

22.    Relators have direct and independent knowledge and information of the allegations set out in this Second Amended Complaint.  Prior to filing this action, Relators voluntarily provided all such information, together with supporting documentation, to the United States, except that information regarding events detailed herein which occurred after the filing of the original Complaint was voluntarily provided to various agencies of the United States before filing this Second Amended Complaint. Relators are "original sources" as that term is used in the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

23.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)-(c) and 31 U.S.C. §3732(a) because defendant Lockheed transacts business in this District and because the claims for payment under the F-22 contract were sent to and processed in this District.  In addition, investigation of the fraudulent overcharges alleged herein is being conducted by United States Air Force auditors located and stationed in this district.

## IV.  RULE 9(b), FED. R. CIV. P. ALLEGATIONS

24.     Much of the factual information necessary to prove the allegations in this Amended Complaint is in the exclusive possession of either one or more of the defendants or the United States; and Lockheed has destroyed important documents, as set forth below.

25.     Relators do not have access to specific information regarding the claims for payment made by defendant Lockheed to the United States, as such information is in the exclusive possession and control of defendant Lockheed and/or the United States.

26.     Relators do not have access to detailed information regarding the claims for payment made by the defendant subcontractors to defendant Lockheed and/or the United States, as such information is in the exclusive possession of defendant Lockheed, the subcontractor defendants, and/or the United States.

27.     Defendant Lockheed has submitted and continues to submit claims for payment to the United States, pursuant to its contract with the United States Air Force, for the F/A-22 and C-130J tooling at issue in this Second Amended Complaint.

28.     Upon information and belief, Relators allege that the subcontractor defendants have submitted and/or continue to submit claims for payment to defendant Lockheed and/or the United States, pursuant to their subcontracts with defendant Lockheed, for the F/A-22 and C-130J tooling at issue in this Amended Complaint.

29.     The false claims and overcharges for F/A-22 and C-130J tooling alleged herein has occurred since at least 1991, and continues as of the date of the filing of this Second Amended Complaint.  Throughout that time, the defendants have, individually and collectively, sought to conceal their overcharging through many different activities meant to prevent the investigation and ready detection of it.  These activities include:  (1) destruction of paperwork; (2) re-numbering tools so that a documented history of work performed on a particular tool would be difficult if not impossible to obtain; (3) performing work on tools without any quality paperwork; (4) mis-identifying

- 8 -

the type of work being performed on a tool, such as labeling extensive and improper rework or repair as routine tool "maintenance," tool "alteration," or tool "set-up;" (5) admittedly failing to track rework labor hours as required by a prior agreement with the United States; (6) constantly changing and thereby fragmenting their computer systems regarding tooling operations so that no single location can be inspected for tooling documents; and (7) randomly dividing their tooling paperwork and sending it offsite to different storage facilities.

30.     In addition, beginning at least several years ago, defendant Lockheed began restricting access by its employees to the documents showing the details of its overcharging. While Relators will, where possible, identify tool numbers regarding which the defendants overcharged the United States, such numbers cover only a small fraction of the tools that are actually involved in this case. The purpose and effect of Lockheed's behavior has been to make it impossible for the Relators to allege all the details regarding the tooling overcharging alleged herein.

31.     Each allegation herein made upon information and belief identifies facts which one, some, or all of the Relators, based upon their personal knowledge and 145 years of experience working at the Lockheed Marietta facility on the F-22 and C-130J programs, have a reasoned factual basis to allege, though lacking complete details. Such a lack of detail is the result, in most instances, of the defendants' efforts to hide their overcharging by inappropriately complicating the gathering and organizing of its tooling paperwork.

## V.    FACTUAL ALLEGATIONS

32.     The conduct alleged herein has occurred since almost the beginning of the F-22 program. Relator Howard began reporting these allegations to the United States Air Force Office of Special Investigations ("AFOSI") in the early to mid-1990s. Relator Wilson joined Relator Howard in reporting the allegations contained herein to the AFOSI a short time later. Over the ensuing years before the original

- 9 -

Complaint was filed in this action, and over the several years since that time, Relators Howard and Wilson have regularly updated their disclosures of Lockheed's overcharging to the AFOSI, and participated in many meetings with attorneys and investigators representing the United States.

33.    Relators Harrison and Moss regularly have provided information to the United States regarding the conduct alleged herein and also have participated in many meetings with attorneys and investigators representing the United States.

**A.    Lockheed's Contracts With The United States.**

34.    In 1991, Lockheed entered into a contract with the United States Air Force to design and develop a new fighter aircraft known as the F-22 Raptor military fighter jet, Government Contract No. F33657-91-C-0006. Since the original award, Lockheed's contract with the Air Force has also been identified as, at least, F33657-97-C-0031; F33657-99-C-0036; and F33657-00-C-0020. All such contracts have been administered by Air Force Program Offices located within the Southern District of Ohio.

35.    The F-22 contract began as a development contract, under which Lockheed promised to design and manufacture several prototype airplanes to be used to test and evaluate performance capabilities.

36.    The development phase of the F-22 program was governed by a "cost-plus" contract, meaning that the United States paid Lockheed for its reasonable and necessary time and materials, plus overhead and profit.

37.    The subsequent production phase of the F-22 program was governed by a "fixed-price" contract, meaning that the United States paid a set amount for each aircraft regardless of the actual costs incurred by Lockheed.

38.    The "cost-plus" contract remains open, and Lockheed has billed and continues to bill the United States for all costs associated with tooling because aircraft tools are the property of the United States. Whether Lockheed billed all costs

associated with tooling to the United States is a fact that is uniquely within the custody and control of Lockheed.

39.     To receive payment from the United States, Lockheed prepared (and continues to prepare) claims for payment or approval and presented them (and continues to present them), or caused/causes them to be presented, to an officer or employee of the United States Government.  These claims for payment were and are submitted to the United States Air Force F-22 Program Office at Wright Patterson Air Force Base, which is within the Southern District of Ohio.  All payments pursuant to the F-22 contract were and are sent to and processed at this location.

### B.     Lockheed's Contracts With as They Pertain to Aircraft Tools.

40.     Each F-22 and C-130J airplane contains thousands of component parts and assemblies.  To make these parts and assemblies, Lockheed needs and uses thousands of tools, many of which are specially made for the particular aircraft being built.

41.     As relevant to the building of airplanes, "tools" are complex, sophisticated devices used to make and/or assemble every part of the F-22 and C-130J, as well as to make other tools needed for that purpose.  Tools vary in size, and some are as large as a 30 ft. by 15 ft. room.  Tools also may be portable or may be permanently fixed at various locations, such as on the aircraft assembly line.  Tools range in price from a few hundred dollars to many hundreds of thousands of dollars.

42.     Lockheed procured most of the tools and dies needed for the F-22 program from tool-making subcontractors.  Eight such subcontractors are named as defendants in this action.

43.     Pursuant to its contracts with the Air Force, the tools at issue in this case were required to conform to all Purchase Order requirements, including detailed tool design, inspection, and quality requirements.  When new tools were made by Lockheed or purchased from a subcontractor, payment from the United States for the

tools was conditioned on the tools being made within specified tolerances to all tool design, inspection, and other Purchase Order specifications.

44.     In order properly to be charged to the contract, new tools made by Lockheed or delivered by one of its tool-making subcontractors must be in such condition as to facilitate their use in manufacturing operations without further rework to bring them into contract and tool design conformance.

45.     Lockheed's tooling vendors submitted invoices for payment for work performed under the F-22 contracts and ordered by Purchase Orders from Lockheed. By such invoices, Lockheed's tooling vendors impliedly or, in most cases, explicitly certified that the tooling and other work complied with all tool design, inspection, and other Purchase Order specifications. Such certifications were required as a condition of payment.

46.     As set forth in greater detail below, representatives of Lockheed Martin Aeronautics Material Management Center ("LMAMMC" or "AMMC") at times purported to inspect vendor tooling at vendor sites but did not prevent new tools from being shipped to Lockheed with nonconformances.

47.     Under its cost-plus contract with the Air Force, Lockheed was permitted to invoice the Government for the cost to make a new tool. Lockheed was not permitted to invoice the Government for the cost of a nonconforming new tool and then invoice the Government for the cost of reworking, repairing or completely re-making that nonconforming tool so that it conformed to requirements. In other words, Lockheed was not permitted to double-charge or otherwise overcharge the United States for making a tool.

48.     At least some of the subcontractor defendants employed, or were owned by, former Lockheed personnel, and as a result received favorable treatment from Lockheed with respect to the acceptance of and payment for nonconforming tools.

- 12 -

49.     Lockheed's quality-assurance policies and procedures, including without limitation its Company Job Instructions, its Manufacturing Standards Manual ("MSM"), and its Supplier Approval and Control Manual, require that Lockheed take necessary steps to ensure that all products delivered from suppliers conform to Purchase Order requirements.  Pursuant to these requirements, all tooling received from Lockheed's subcontractors must undergo a series of highly-precise and rigidly-controlled inspections.  The inspection criteria may properly be deemed satisfied only upon a determination that the tool corresponds in all respects to all drawing requirements and contractual terms and conditions.

### C.     Making And Inspecting Aircraft Tools.

50.     The making and inspection of tools for the F-22 and C-130J programs are the responsibility of Lockheed's tooling departments.  These departments include Manufacturing Planning, Tool Design, Tool Manufacturing, Tool Inspection and Tool Control.

51.     When Lockheed needs a new tool or requires certain action with respect to an existing tool, a "Tool Order Serial" form, or "TOS," is created.  This document also is referred to as a "tool order."  Each TOS has a unique identification consisting of a letter and five numbers, which appears at the top left corner of the TOS.  The TOS references the tool design and associated quality documentation needed to make the tool.  It also indicates whether the tool will be made by Lockheed or a tool-vendor subcontractor.  Each TOS is generated by Lockheed's "Genplan" computer system.

52.     A TOS is a work package for Lockheed's Tool Design and Tool Manufacturing departments, or for Lockheed's tooling vendors when they are performing the tooling work.  Among other things, the TOS forms define the function of the tool, assign identification for each tool, and reflect the authorizations and appropriate approvals for the work being performed.

- 13 -

53.     Each TOS identifies the number of the tool to which it relates.  A tool number is comprised of two parts.  The first part of the tool number is the number of the section of the aircraft on which the tool will be used.  The part number usually has two numbers.  The first number identifies the basic part, and the second number (which usually consists of three digits, such as 101, 102, 901, or 902) usually indicates whether that specific part is for the left or right side of the aircraft.  The second part of the tool number is a combination of letters called the "Tool Code" that identifies the precise type of tool.  For example, the suffix "FAJ" refers to a "floor assembly jig" used to assist with assembling various parts of the aircraft.

54.     As an example, 5HF10000-101-FAJ is the complete number of a floor assembly jig that is used for part 5HF10000-101.  A tool with number 5HF10000-102-FAJ would refer to a completely different floor assembly jig that is used for the mirror image part, 5HF10000-102.

55.     On the right hand side of each TOS is a box for "inspection stamp buyoff."  Under proper procedures, a TOS is not closed out until a tool inspector has stamped that box to indicate that the tool meets the tool design requirements and has passed all proper inspections for the work authorized by the TOS.  Until the TOS is closed out or "bought off," the costs associated with such work are billed to that TOS.

56.     A new tool is made pursuant to a "make new" TOS form or "tool order."  The costs associated with the manufacture of the tool are billed to its make new tool order until that tool order is "bought off" or closed out.

57.     Changes to a tool are made pursuant to an "alter" TOS.  The costs associated with the alteration of the tool are billed to the alter TOS until that tool order is "bought off" or closed out.

58.     Beginning in the 1990s, Lockheed, increasingly relied on outside tooling vendors to manufacture most of the tools needed to build the F-22 instead of performing the work in-house.  Lockheed issued Purchase Orders and sent to these

- 14 -

tooling vendors the make new TOS and all associated documentation for making the new tool, except when, as set forth below, Lockheed contracted with outside vendors to design the tools they were to produce.

59.    Lockheed purports to require that its tooling vendors, including without limitation the defendant subcontractors, deliver tools which are fully conforming to all drawing and contract requirements.  For example, in a January 15, 1998 Internal Audit, Lockheed acknowledged that "[t]he standard purchase order issued to tooling suppliers states that (a) the supplier provide [sic] tools which are free from nonconformances in material and workmanship and conform to applicable specifications, drawings, or other documents; and (b) for any rejected tools, Lockheed Martin may require that the supplier refund the price of any such item."

60.    Lockheed maintains specific Company Job Instructions in (at least) its AeroCode computer network system that detail, among other things, the quality procedures to be followed in making, inspecting, rejecting and maintaining project tools.

61.    Tool rework occurs when a tool does not meet the tool design and other Purchase Order specifications and must undergo significant change to bring it within those specifications and make it useful in construction of aircraft.

62.    In contrast to tool rework, routine tool maintenance involves relatively minor work on a tool, as when a tool becomes slightly worn through use.

63.    Lockheed is required to maintain records of rework of tools and any costs associated therewith.  Moreover, due to prior problems with such record-keeping, Lockheed has specifically promised the United States that it would maintain records demonstrating tool rework.  For example, in a letter agreement dated December 15, 1994, Lockheed Director of Accounting Gunnar M. Haase asserted that Lockheed was implementing "a system for recording the actual costs of rework and repair."  That system, according to Lockheed, would "provide actual cost data in lieu of the estimates

- 15 -

that have previously been utilized in LASC's proposals." This system was never properly implemented.

64.     Tool Inspectors, including Relators Harrison and Moss, perform a critical quality assurance function within Lockheed by ensuring that tools conforms to all quality, drawing, and manufacturing requirements. If a tool is nonconforming, then the aircraft parts made by that tool will be nonconforming. If the tool is one that constructs other tools, then those tools will be nonconforming, in addition to the parts produced by those tools. If the tool is used in aircraft assembly, then assembly will not take place properly.

65.     After a new tool is made by Lockheed or a subcontractor, Lockheed is required to inspect it for conformance to design and contract requirements. The procedures for tool inspection are set forth in, among other places, Lockheed's Company Job Instructions. Tool inspection is required to be done by personnel such as Relators Harrison and Moss, who have specialized training in tool inspection and access to the proper equipment and/or environmentally controlled rooms to conduct proper inspections.

66.     A critical aspect of tool inspection is verification that the physical characteristics of the tool conform to the tool design, which is referenced on the associated TOS. Pursuant to Lockheed's quality-assurance and inspection procedures, if a tool fails inspection, Tool Inspection personnel are required to complete either a "Tool Hold" form or a 5140 Tool Rejection form.

67.     A Tool Hold is issued when there is an open TOS pertaining to the tool. The presence of a Tool Hold requires that a tool is not to be used in the manufacture of aircraft until the tool is reworked to meet the applicable standards. A 5140 Tool Rejection is issued when there is no open TOS so that planning will know to open a new TOS (an "alter" order) for the rework to the tool. Subsequent rework labor hours will be charged to the new "alter" TOS.

- 16 -

68.    If a tool fails inspection, Tool Inspectors also are required to describe the observed nonconformances. Tool Inspectors can set forth the nonconformances directly on the Tool Hold or form 5140; however, in many or most cases, those forms do not provide enough room adequately to describe the nonconformances. The inspectors then utilize a document entitled Tool Inspection Statement of Condition ("TISOC"). When necessary to fully document all noncom-formances. Tool Inspectors attach additional pages to the TISOC of set forth numerous nonconformances.

69.    Because of the nonconforming work done by Lockheed's outside vendors, Lockheed Tool Inspectors have issued TISOCs for vendor-built F-22 tools up to 27 pages long.

70.    Under Lockheed's written procedures, compliance with which is required by Lockheed's quality control system, TISOCs, Tool Holds, and Tool Rejections must be preserved so that nonconforming tools can be identified and corrected.

71.    For at least the first several years of the F-22 project, Lockheed required as part of the inspection process the performance of a "Tool Try" on each new tool whereby that tool actually was used to make a new production part. Successful completion of the Tool Try is verified by a Lockheed Tool Inspector, who affixes a stamp in the "Buyoff" box on the TOS discussed above.

72.    Most if not all of Lockheed's tooling vendors do not have Lockheed trained Tool Inspectors on site. Instead, those vendors use members of LMAMMC to conduct inspections. LMAMMC representatives do not have adequate training or equipment properly to inspect aircraft tooling.

73.    Even when some inspection of new tools is accomplished at the outside vendor site, Lockheed remains responsible for verifying that new tools meet tool design and other contractual requirements.

- 17 -

**D.    Charges For Tooling Work.**

74.    Upon information and belief, many of Lockheed's Purchase Orders to its tooling vendors identified the exact work to be performed by that vendor and, in particular, referenced at least a TOS number, a tool number, or both.  As a result, the specific amounts that Lockheed paid to its tooling vendors for particular work can be readily ascertained simply by comparing Purchase Order amounts with the work indicated on the TOS form or other tooling documents identified by tool number.

75.    Upon information and belief, Lockheed tooling vendors sent invoices to Lockheed for all work ordered by the Purchase Orders.  These invoices reference the associated Purchase Order, tool number, TOS number, or some combination of this information.

76.    On information and belief, Lockheed paid such invoices and did not (as it was required to do) condition its payment of such invoices upon a determination of whether the tooling work was performed according to all Purchase Order requirements, including the requirement that the tools meet the tool design requirements.  Also upon information and belief, Lockheed made these payments without ensuring that its tooling vendors had satisfied all Purchase Order requirements, Lockheed improperly sought and received reimbursement from the United States for amounts paid to tooling vendors.

77.    By and through their invoices to Lockheed, Lockheed's tooling vendors certified that the billed-for work had been performed in accordance with all Purchase Order and tool design requirements.

78.    Lockheed submitted claims for payment to the Air Force that included amounts paid by Lockheed to its tooling vendors.  In addition, Lockheed's claims for payment to the Air Force included all costs incurred by Lockheed for tooling work performed by its own personnel, including costs for rework of nonconforming tools.

79. On information and belief, rarely, if ever, did Lockheed perform tooling work, or pay for work performed by its tooling vendors, without passing those costs to the United States.

80. By and through its claims for payment to the Air Force, Lockheed certified that the billed-for work had been performed in accordance with all contract requirements.

**E.  Lockheed Charges The United States Multiple Times For The Same Tool.**

**1.  Introduction and Summary.**

81. Since the early 1990s, when Lockheed began relying heavily on outside vendors to produce aircraft tools, Relators have observed on a regular basis, with respect to hundreds or thousands of tools, new tools that do not meet the required specifications. These nonconforming tools also were not made in accordance with the requirements of Lockheed's contract with the Air Force, and the nonconforming tools could not be used in making the F-22 aircraft without being reworked.

82. Lockheed concealed from the United States the nature and extent of its vendors' delivery of nonconforming tools.

83. Beginning early in the F-22 program, Lockheed charged the United States multiple times for tools used on the project. Lockheed accomplished this overcharging by first charging the United States for new, nonconforming tools and then charging the United States for replacement tools or for the extensive rework needed to bring the nonconforming tools into conformance.

84. On information and belief, despite receiving nonconforming tools, Lockheed routinely paid its tooling vendors for new tools regardless of whether the tool passed proper inspection or Tool Try and submitted claims to the United States for payment of those tools.

- 19 -

85.     In seeking payment from the Government for nonconforming tools, Lockheed falsely certified that the work performed was in accordance with contract terms when in fact it was not. The claims for payment submitted by Lockheed pursuant to the F-22 contract regarding nonconforming tools were false claims. Lockheed's management was aware of, or recklessly disregarded, this practice.

86.     After accepting a nonconforming tool, Lockheed either: (1) reworked the tool so that it confirmed to contract requirements, (2) scrapped the tool and started over, (3) began using the nonconforming tool in aircraft production, or (4) engaged in a scheme involving some combination of the above.

87.     Each of these outcomes has its own set of costs and damages to the United States, as detailed below; however, in each case, the expense to the United States of procuring the F-22 has been substantially increased beyond the charges which were necessary and appropriate under its contract with Lockheed.

88.     Lockheed's actions in knowingly and repeatedly charging the Air Force more than once for the same tools violated the terms of its contracts with the United States. Lockheed was aware of, or recklessly disregarded, these violations.

2.     **Lockheed Bills the United States for Rework to Tools which Already Were Supposed to Have Met the Tool design Requirements.**

89.     When Lockheed received nonconforming tools from its outside vendors and elected to rework those tools, the rework occurred in one of three ways: (1) Lockheed's own personnel performed the rework in-house at Lockheed, (2) Lockheed sent the nonconforming tool to another outside tooling vendor to perform the necessary rework, or (3) on rare occasions, Lockheed returned the nonconforming tool to the originating vendor for rework.