| | |
|----|------|
| 45 | 7992 |
| 35 | DFMY |
| 70 | REIG |
| 35 | DFMW |
| 35 | DFML |
| 35 | DFMB |
| 35 | DFMD |
| 35 | DFMG |
| 35 | DFMF |
| 35 | DFMH |
| 35 | DFMM |

305. The extensive rework of nonconforming tools pursuant to a TMWR card was accomplished by Lockheed personnel and/or one or more of Lockheed's tooling vendors. When Lockheed's tooling vendors performed such work, they invoiced Lockheed for amounts that far exceeded what should have been necessary to perform the "maintenance" indicated on the TMWR cards. When Lockheed personnel performed such work, they charged labor time and materials to the contract (via the blanket labor charge on the TMWR card or other schemes alleged herein) that exceeded any reasonable amount needed to perform the indicated "maintenance."

306. The following is a partial list of tools that were defectively made by one of Lockheed's tooling vendors and, thereafter, were reworked into tool design compliance. The rework was accomplished, in many instances, by Lockheed issuing a TMWR card for the work. Upon information and belief, both the amounts for the

nonconforming new tool and the amounts to rework them to tool design compliance were charged by Lockheed to the United States:

| TOOL # | RELATED TOS # | DATE | TMWR CARD # | DATE |
|---|---|---|---|---|
| 5HF42543-111-MEU-009 | B53791 | 11/12/01 | | |
| 5HF42544-111-MEU-009 | B53795 | 11/12/01 | | |
| 5HF42544-111-MEU-010 | B53796 | 11/12/01 | | |
| 5HF42557-113-MEU-005 | B53812 | 11/14/01 | | |
| 5HF42557-113-MEU-008 | B53813 | 11/14/01 | | |
| 5HF42557-113-MEU-007 | B53814 | 11/14/01 | | |
| 5HF45550-107-MEU-009 | B53817 | 11/14/01 | | |
| 5HF45550-107-MEU-010 | B53818 | 11/14/01 | | |
| 5HF46505-121-MEU-009 | B53833 | 11/14/01 | | |
| 5HF46505-121-MEU-010 | B53834 | 11/15/01 | | |
| 5HJ53000-135-MEU-009 | B53837 | 11/15/01 | | |
| 5HP41000-101-MEU-006 | B53840 | 11/15/01 | | |
| 5HP41000-102-MEU-006 | B53843 | 11/15/01 | | |
| 5HR40310-101-MEU-006 | B53849 | 11/15/01 | | |
| 5HW82374-101-MEU-008 | B53851 | 11/15/01 | | |
| 5HW82374-101-MEU-009 | B53852 | 11/15/01 | | |
| 5HW82374-102-MEU-008 | B53855 | 11/15/01 | | |
| 5HW82374-102-MEU-009 | B53856 | 11/15/01 | | |
| 5HW82374-103-MEU-008 | B53858 | 11/15/01 | | |
| 5HW82374-103-MEU-009 | B53859 | 11/15/01 | | |
| 5HW82374-104-MEU-008 | B53861 | 11/15/01 | | |
| 5HW82374-104-MEU-009 | B53862 | 11/15/01 | | |

| | | | | |
|---|---|---|---|---|
| 5HW82376-101-MEU-008 | B53864 | 11/15/01 | | |
| 5HW82376-101-MEU-009 | B53865 | 11/15/01 | | |
| 5HW82376-103-MEU-008 | B53867 | 11/15/01 | | |
| 5HW82376-103-MEU-009 | B53868 | 11/15/01 | | |
| 5HW01293-102-MEU | | | 085450 | 03/17/03 |
| 5HF46094-101-JDP3 | | | 085444 | 03/17/03 |
| 5NK01260-101-MFM-002 | | | 085626 | 02/24/03 |
| 5HF13020-901-FDJ | | | 076232 | 10/29/02 |
| 5HW02106-901-MED-002 | | | 085490 | 02/28/03 |
| 5HW02106-902-MED-002 | | | 085490 | 02/28/03 |
| 5HF46093-101-JDP2 | | | 085445 | 03/17/03 |
| 5HF11735-106-LF | | | 085598 | 04/05/03 |
| 5HF75202-101-JDP3 | | | 085539 | 04/29/03 |
| 5HF75202-102-JDP3 | | | 085540 | 04/29/03 |
| 5HC12013-907-AJ | | | 076638 | |
| 5HC12013-908-AJ | | | 076639 | 02/18/03 |
| 5HW01295-106-MBF-2 | B44897 | | 075858 | 03/27/01 |
| 5HW01295-105-MBF-2 | B44897 | | 074739 | 03/27/01 |
| 5HW01295-105-MBF-2 | B44897 | | 075855 | 03/26/01 |

307. Lockheed's practice of disguising rework as routine "maintenance" can be uncovered by comparing the tooling work ordered on the TMWR card with the number of hours expended in performing the "maintenance." Such a comparison will reveal that Lockheed and/or one of its tooling vendors expended hours for "maintenance" that far exceeded the amount actually necessary to perform the indicated work.

### 4.  Rework disguised as tool "Set-up."

308.   The F-22 is assembled on the "rail line," which is akin to an assembly line.  Some F-22 tools were set up on the rail line for use in constructing the F-22

309.   Tool engineer Brian Drummond allocated several hundred hours of labor time for the purpose of setting up particular F-22 tools on the rail line.  However, the allotted hours exceed a reasonable amount of time for set-up.

310.   As tools were set up on the rail line, Lockheed performed in-house rework to them and billed that rework as set-up time.  Upon information and belief, Lockheed submitted false claims to the United States for payment of rework that was disguised as tool set-up.

### 5.  Reworking standard tools into project tools.

311.   A "standard" tool is defined by Lockheed as a tool that is used for general productive use on more than one project.  A "project" tool, in contrast, is a tool made and used for a specific product and applicable to a specific contract.  Lockheed uses both standard tools and project tools in making the F/A-22 and C-130J.

312.   The costs for standard tools and project tools used by Lockheed on the F-22 and C-130J projects are charged to the United States.

313.   After charging the Government for the cost of standard tools used on the F-22 and C-130J projects, Lockheed personnel often reworked standard tools in order to fashion them into project tools.

314.   After making a project tool from a standard tool, Lockheed then charged the Government the full price for the project tool as though it had been newly made.  In this way, Lockheed charged the Government twice:  once for the work necessary to make the standard tool; and then again for a completely new project tool even though the Government had already paid for most of the work for the supposedly "new" tool when it was originally made as a standard tool.

- 74 -

315.   Lockheed reworked standard tools into project tools, and thereby double charged the Government, on a regular basis since 1991.  The precise standard tools that were involved in this scheme can be determined by comparing Lockheed's list of standard tools charged to the F-22 project with a physical inventory of those tools.

316.   This comparison will often show double charges for a standard tool, as when a new standard tool was purchased to replace a standard tool that was reworked into a project tool.  This comparison also will reveal that Lockheed simply does not have in its possession many previously purchased standard tools, even though Lockheed charged the United States for them.  This means that Lockheed has yet to replace the missing standard tools that were reworked into a project tool.

### 6.   Costs for tool rework or repair charged to the cost of making aircraft parts.

317.   Some of Lockheed's F-22 tool vendors also made parts for the F-22.  In such cases, those vendors invoiced Lockheed for two things: (1) the amount of the Purchase Order for the new tool; and (2) the labor hours and material necessary to make the aircraft part.  Lockheed fully paid all such invoices.

318.   When Lockheed's tooling vendors made a new tool that did not conform to tool design and other Purchase Order specifications, those vendors improperly invoiced Lockheed for the entire cost of that nonconforming new tool.  Then, for vendors that made both tools and F-22 parts, the same vendor incurred additional labor charges needed to rework the nonconforming tool into tool design compliance.  In these instances, the labor charges to rework the tool were improperly allocated to the production of the associated part for the airplane.

- 75 -

319. When this type of overcharging occurred, the invoices from Lockheed's tooling vendors will show hours expended in building the aircraft part far in excess of the hours reasonably needed for that effort.

320. Lockheed employed this same general scheme with its own production personnel by having them rework nonconforming new tools and charge the associated labor amounts to the parts they were making. This scheme will be apparent by comparing the production work that the Lockheed employee was tasked to perform with the number of hours actually expended in doing such work.

321. Lockheed's procedures (at a minimum, its Labor Manual) require that employees have a Work Authorizing Document readily available to them prior to beginning their work. These Work Authorizing Documents must contain an adequate explanation of the work to be performed and are required to identify the appropriate labor account that should be charged for the work.

322. Lockheed requires that each employee accurately and completely record his labor charges in a timely manner. This includes indicating in their labor charges the precise work done and the authorizing document from which they were working.

323. Lockheed requires that its management employees train all employees regarding the accurate recording of labor hours. Lockheed requires that management personnel provide employees the Work Authorizing Documents for all work performed. Lockheed also requires its management personnel ensure the accuracy of the employee labor charges by, at a minimum, reviewing them weekly.

- 76 -

324.    On many occasions, Lockheed violated these procedures and verbally ordered its production personnel to perform extensive repair or rework on tools. This was done by Lockheed in a deliberate attempt to avoid documenting the precise type of work being performed on tools. Production personnel were also instructed to make their own project tools and reference them as "shop aids."

325.    Attendant to this scheme, employees charge work associated with "shop aids" to "blanket" labor charge numbers instead of to a specific TOS number, thus ensuring that no record was made of the work done, the amount paid for that work, or the particular part or tool impacted by the work. This practice violated (among other things) the Lockheed Labor Manual, which requires that workers accurately record the number of hours performed for each work order, thereby making it possible to see the labor charges allocated for each job.

326.    Throughout the first several years of the F-22 project, Lockheed required that its tooling personnel charge their time by department and cost center. By this process, Lockheed carefully tracked the charges for any and all work performed in making tools, except, as set forth above, Lockheed has not separately tracked rework costs. At least by the mid 1990s, Lockheed started ordering its employees to charge their labor time to the blanket labor numbers, which often meant that the exact work being done could not be readily ascertained. This was a deliberate scheme by Lockheed to make it more difficult, if not impossible, to track the employees actually performing work on the tools.

327.    It is a violation of Lockheed's procedures (including, at least, its Labor Manual) to deliberately mischarge labor hours. By its misuse of "blanket" labor

- 77 -

charges, Lockheed deliberately mischarged labor hours by having workers in the production trades perform extensive tooling re-work, as well as manufacture of project tools that were mis-labeled as "shop aids."

328. In order to obscure its charges for rework and repair of nonconforming tools, Lockheed often deliberately failed to properly document such work on required forms. For instance, Lockheed ordered extensive rework or repair of nonconforming tools on forms entitled Accept No Verbal Orders ("ANVOs"). ANVOs are unofficial documents. Under Lockheed's contracts with the United States, no work may be performed on any tool pursuant to an ANVO form.

329. On a regular basis since 1991, Lockheed used ANVO forms to order both its production and tooling personnel to perform extensive rework on nonconforming tools. Lockheed did this to avoid properly documenting such work. In connection with such ANVO orders, Lockheed employees were told to charge their time for extensively reworking or repairing nonconforming tools to "blanket" labor charge numbers.

330. Similarly, Lockheed often by-passed its TOS documentation procedure by ordering rework pursuant to Tool Order Reroute Or Amendment forms (in addition to TMWR cards, as discussed above). These are unofficial forms that cannot be used alone to order rework or repair of nonconforming tools.

331. Despite this, Lockheed on many occasions used Tool Order Reroute Or Amendment forms as the sole documentation of rework of nonconforming new tools. For example, the following tools were made by a Lockheed tooling vendor and then reworked or repaired pursuant to the Tool Order Reroute Or Amendment

- 78 -

forms: 5HW01290-101-MED-2-002, Make New TOS # B52265 (dated 02/13/01), Tool

Order Reroute Or Amendment form dated 04/05/01; 5HW01290-102-MED-2-002, Make

New TOS # B52267 (dated 02/13/01), Tool Order Reroute Or Amendment form dated

04/05/01; 5HC12012-901-MEB, Make New TOS # B51976 (dated 01/19/01), Tool Order

Reroute Or Amendment form dated 01/23/01. Upon information and belief, Lockheed

charged the Government for the new tool, and charged the Government again for the

amounts needed to perform the rework or repair called for on the Tool Order Reroute Or

Amendment forms.

     332.   On other occasions, Lockheed abused the Tool Order Reroute Or

Amendment forms in tandem with its efforts to hide rework or repair pursuant to another

scheme alleged herein. For instance, even after Lockheed improperly disguised rework

and repair as "alteration" pursuant to an Alter TOS, sometimes further rework or repair

was ordered pursuant to a Tool Order Reroute Or Amendment form.

     333.   An example of Lockheed ordering rework pursuant to a Tool Order

Reroute Or Amendment form, even after work was done on the tool pursuant to an Alter

TOS, is the following: 5HC12010-901-MES-2, Alter TOS # B51062 (dated 09/21/00),

Tool Order Reroute Or Amendment form dated 04/05/01. Upon information and belief,

Lockheed charged the Government for the new tool, the "alterations" for the new tool,

and for the amounts needed to perform the rework or repair called for on the Tool Order

Reroute Or Amendment forms.

     334.   In addition, Lockheed frequently received tools from outside

vendors that were missing details or assemblies. A detail is a small item that is

permanently affixed to a tool, such as a pin or a screw.  An assembly is a small item that goes with a particular tool but is removable.

335.   Production crews cannot use a tool until all details and assemblies are in place.  Instead of waiting for the vendor to provide the appropriate details and assemblies, Lockheed frequently made details and assemblies in-house.  Upon information and belief, Lockheed charged the United States for making details and assemblies which should have been produced by outside vendors.

336.   Lockheed billed these charges pursuant to some of the schemes alleged herein, such as billing to a blanket production charge or using an ANVO.

337.   To further hide improper labor charges, Lockheed has altered its employee badge procedure.  For many years Lockheed issued each of its employees a unique badge, with unique identifying information, that would further assist in recording the exact work performed by each person.  Recently, though, in order to further obscure the type of work being done, Lockheed instituted a "Common Badge Program" that eliminated much of the information specific to each employee.

### 7.   Charging Rework for the F-22 to the C-130J program and vice versa.

338.   On many occasions Lockheed personnel making new tools or reworking defectively made new tools for the F-22 were ordered to charge their time to the C-130J program.  Conversely, Lockheed personnel who were making or reworking nonconforming tools for the C-130J project were ordered to charge their time to the F-22 program.

339.   By cross-charging for tooling work on the F-22 and C-130J programs, Lockheed obscured its overcharging, making it impossible to determine the

exact amount of tooling work done or charged to either program. Upon information and belief, Lockheed is required by its contracts with the United States and by its own internal systems to be able to track all such tooling work.

340. On other occasions, unnecessary duplicates of a tool were made for either the F-22 or C-130J programs, with the entire cost charged to the United States. Then, Lockheed began using the duplicate tools on the other program, and identified such tools on a Make New TOS. Lockheed charged the United States the full price for the newly-identified tool, even though the United States already had paid for the tool as a "duplicate" on the other aircraft project. On most if not all occasions, duplicate tools were unnecessary for the work being performed.

341. This scheme will be evidenced by auditing Lockheed's charges for the tools for each program. Relevant documents include the list of tools made and used on both projects, along with the labor charges and invoices showing which project was charged for the work for those tools.

### 8. Shop aids reworked into or used in place of tools.

342. It is common at Lockheed for personnel to use an informal "shop aid" to assist in making a tool or a part. Shop aids are not subject to tool inspection requirements and are virtually uncontrolled. Shop aids can never be used as a tool to make or assist in making a production part or tool.

343. Shop aids are made pursuant to verbal orders; ANVOs; or informal shop order documents commonly referred to at Lockheed as "snap outs." A snap out is an unofficial document that cannot be used to order any work on a tool.

344. On regular occasions throughout the F-22 program, Lockheed personnel made shop aids and then reworked them into production tools. When this occurred, Lockheed did not perform required inspection of those new "tools."

345. The costs associated with making the shop aid were first charged to the aircraft part being made. Then, when it was reworked into a production tool,

- 81 -

Lockheed charged the United States for the full price of a new tool. As a result, Lockheed charged the United States twice: once for the shop aid and again for the production tool.

346. Lockheed also regularly ordered and bought tools that were never used for aircraft assembly because they were defective. In those instances, Lockheed personnel instead decided to use shop aids to make the tool or part that would have been made by the nonconforming tools. This also resulted in double charges to the United States: once for the defectively made new tool and again for the labor charges to make the shop aid, which were charged to the part being made.

347. The following are tool numbers that Lockheed first made as a shop aid, and then subsequently re-worked into project tools. In each instance, these shop aids were not properly inspected and, upon information and belief, resulted in a double charge to the Government as described in the preceding paragraphs: 5HF11831-101-ATJ and 5HF11831-102-ATJ.

348. Other times, Lockheed mis-labeled a project tool as a "shop aid" in order to charge the Government again for a new project tool. For example, project tools known as "BUPs," which are used by Lockheed personnel as a back-up plate to hold a particular aircraft part in place while other work is being performed on it, are project tools that were often re-labeled by Lockheed as "shop aids." These "BUPs" were used as mill fixture tools. After such re-labeling, Lockheed ordered and invoiced the United States for new project tools to "replace" the project tools that were newly referenced as mere "shop aides." Such new project tools were not needed.

### 9. Changing the TOS "Making" number.

349. On a regular basis since at least 1992, Lockheed ordered "Make New" tools from its vendors and indicated on the associated TOS that the work was being performed by an outside vendor, but that number was subsequently changed when the vendor delivered nonconforming tools.

- 82 -

350. After the tool was received at Lockheed and found to be defective, and after the tooling vendor was paid, Lockheed simply changed the "Making" number on the TOS to indicate that it was being made in-house.

351. This alteration of the original TOS form occurred either by changing the number in the Genplan system and printing a new TOS form, or by crossing out the "Making" number with a pen and hand-writing in the newly-designated "Making" entity. The newly designated entity within Lockheed was then paid to remake or to extensively rework the nonconforming tool, despite the fact that payment had already been made by Lockheed to the original tooling vendor.

352. This overcharging can be determined by comparing the amounts paid by Lockheed for each of its new tools. When the "Making" number is changed after a tooling vendor delivers a nonconforming tool, there will be at least duplicative charges for that tool.

### i. Lockheed charged for work it never performed.

353. Lockheed often billed the Government for tooling work that never occurred. Lockheed accomplished this by: (1) misidentifying the company performing the work indicated on the TOS forms; (2) paying for tools that were never delivered; and (3) paying tooling vendors for tooling work that was simultaneously charged by Lockheed to in-house labor charges.

354. TOS forms each identify the company performing the indicated work by identifying such company by numeric code under the heading "Making" on the TOS form. Lockheed tooling vendor codes usually began with a "56" prefix, and the Lockheed code prefixes usually began with a "47" prefix.

355. Many times since 1991, Lockheed identified the "Making" company on a TOS for a new tool as an outside vendor even though the new tools were made by Lockheed personnel. The identified Lockheed vendor was paid even though that vendor had not actually made the new tool or performed any other work on the tool.

- 83 -

356.    Lockheed thereafter charged the United States for amounts paid to its tooling vendor for supposedly making the new tools, and Lockheed also charged the United States for the costs of Lockheed's own personnel who actually did make the new tool.

357.    Lockheed also paid its tooling vendors for tool kits that were either empty or largely incomplete. A tool kit is a box of small tools that is used by assembly personnel to facilitate their work in assembling the aircraft. Tool kits comprise a subclass of standard tooling. Lockheed ordered the tool kits from a tooling vendor, including non-party Tools & Metals, Inc.

358.    Lockheed has received empty or incomplete tool kits from vendors on numerous occasions over the past several years. Despite this fact, Lockheed paid the tooling vendor for each of the tool kits and passed that charge on to the United States. Thereafter, Lockheed purchased more tool kits, or purchased the missing parts of the tool kits, and invoiced the Government for them.

359.    Lockheed's overcharging for empty or incomplete tool kits will be apparent by comparing Lockheed's invoices for tool kits, as a much larger number will have been ordered and paid for than the number actually used on the F-22 program.

360.    Upon information and belief, the following are tool kit numbers that identify tool kits that were ordered and/or purchased by Lockheed in varying quantities, most or all of which were empty, incomplete, or never delivered. Upon information and belief, Lockheed fully paid for these tools kits and then charged the United States for the amounts needed to purchase replacement tool kits for those that were empty or never delivered or charged the Government for the amounts needed to purchase the tools missing from the incomplete kits:

| | | |
|---|---|---|
| KNM60KH01-0230D | KHM96MD90-005D | KH165KH05-0220D |
| KNM40KH02-0230D | KN260KH67-0220D | KNM30KH11-0220D |
| KNM50KH03-0230D | KNM20KH69-0220D | KNM30KH28-0220D |
| KNM40KH04-0230D | KNM30KH56-0220D | KNM30KH11-0220D |
| KNM250KH38-0220D | KH160KA90-0005D TL3 | KNM20KH04-0220D |
| KH160KA90-0005D | KH230CA90-0000D | KN190KH57-0220D |
| KNM30KH01-0225D | KK090XD00-001 | KNM20KH69-0220D |
| KH250KA90-0005D | KK120XD00-0001 | KN190KH58-0220D |
| KN190KH07-0225D | KHM76KR10-0000D | KN190KH57-0220D |
| KHM90KR00-000D | KH190HA10-0000D | KNM40KH33-0220D |
| KNM30KH10-0225D | KN250KH02-0820D | KNM30KH26-0220D |
| KNM40MH02-0226D | KHM80KA10-0000D | KNM30KH21-0220D |
| KNM30KH55-0220D | KHM76KR10-000D | KN090KH71-0220D |
| KNM50KH53-0220D | KH220RA90-0000D | KNM20KH07-0220D |
| KN260KH68-0220D | KH250HA10-0000D | KNM30KH30-0220D |
| KN360KH65-0220D | KH160KA90-005D | KNM30KH21-0220D |
| KN260KH67-0220D | KJM40KC90-001D | KN250KH-0220D |
| KN190KH58-0220D | KK190HA10-0005D | KNM20KH07-0220D |
| KN090KH74-0220D | KJM40KC90-0001D | KN250KH06-0220D |
| KH500XH00-0000D | KH220RA90-0000D | KNM30KH30-0220D |
| KN190KH57-0220D | KH160KA90-0005D | KNM20KH40-0220D |
| KJ260FC00-0000D | KK190HA10-0005D | KH165KH05-0220D |
| KN190KH57-0220D | KH250HA10-0000D | KNM40KH08-0220D |
| KN190KH72-0220D | KHM80KA10-0000D | KNM30KH21-0220D |
| KNM20KH01-0223D | KNM20KH05-0225D | KNM30KH36-0220D |
| KNM20KH77-0220D | KH160KA90-0000D | KNM20KH19-0220D |

| | | |
|---|---|---|
| KNM20KH62-0220D | KN190KH03-0226D | KH250KA90-0005D |
| KNM70KH51-0220D | KNM20KH06-0226D | KH250KA90-0000D |
| KN190KH58-0220D | KN310KH20-0225D | KH310KA90-0000D |
| KH190KH72-0220D | KH160KA90-0000D | KH130KA90-0000D |
| KN250KH38-0220D | KNM900B00-001B | KH250KA90-000DX |
| KN190KH57-0220D | KN310KN20-0225D | KH190KA90-0000D |
| KNM20KH69-0220D | KNM20KH17-0225D | |

361.   In addition, on numerous occasions since 1991, Lockheed charged its own internal labor codes for making new F-22 and C-130J tools even though Lockheed already had paid tooling vendors for that work.

362.   The following are C-130J tools that were made by a tooling vendor in the late 1990s or early 2000s that were charged to Lockheed in-house labor codes. Upon information and belief, Lockheed not only charged these tools to in-house labor codes, but Lockheed also paid the tooling vendor who actually made the tools, and both sets of charges were invoiced to the United States:

| | |
|---|---|
| 337009-MEA003 | 3305015-L-42C |
| 337715-38-19A | 3305015-R-42C |
| 362017-1-19A | 3305016-42C |
| 370002-1-MEA4 | 3305017-42C |
| 389041-3-19A | 3305049-1-42C |
| 3305014-L-42C | 3327600-1-MTT |
| 3305014-R-42C | |

363.   The following are F-22 tools that were made by a tooling vendor in the late 1990s or early 2000s that were charged to Lockheed in-house labor codes.

Upon information and belief, Lockheed not only charged these tools to in-house labor codes, but also Lockheed paid the tooling vendor who actually made the tools, and both sets of charges were invoiced to the United States:

| | |
|---|---|
| 5HC12020-901-MEL002 | 5HU04511-101-FTP |
| 5HC12020-901-MES001 | 5HU04511-102-FTP |
| 5HC12020-901-MES002 | 5HW01213-101-ATJ |
| 5HC12012-901-MEC002 | 5HW01214-101-ATJ |
| 5HF11765-103-MF | 5HW02502-102-ATJ |
| 5HF11765-104-MF | |

### J. Lockheed Permitted Outside Vendors to Create Tool Designs Without Lockheed Approval.

364. Federal Acquisition Regulation 46.105 requires contractors, such as Lockheed, to control the quality of tool designs. Upon information and belief, Lockheed's contract with the United States requires it to follow this regulation.

365. As set forth in the Internal Audit, "Controls are not in place to ensure that vendor tool designs are reviewed by the requesting LMASC tooling engineers prior to fabrication of the tools."

366. For example, "Suppliers are not required by the purchase order to provide their tool designs to LMASC IPT [Integrated Product Team] tooling engineers for approval prior to making the tools . . ."

367. As a result, "A tool could be made to a drawing that has not been approved by the applicable LMASC tool engineer and this could result in an improper tool being made."

368. Despite the Federal Acquisition Regulations and the likelihood of improper tools being produced, on or about February 28, 1996, Michael J. Carbone of

defendant Aerobotics Engineering & Manufacturing sent a letter to Lockheed requesting that Lockheed not require it to send tool designs to Marietta for approval because it would delay tool deliveries.

369.    Upon information and belief, Lockheed submitted false claims for payment to the United States for the cost of tools produced by vendors without prior approval of the tool designs.

370.    As a result of unapproved tool designs, vendors produced tools which were not fit for their intended purpose in the fabrication of the aircraft and which had to be reworked, which were scrapped, or which were used in the production of the aircraft anyway, pursuant to the schemes set forth above.

371.    Lockheed submitted false claims for payment to the United States for the cost overruns associated with nonconforming tools resulting from vendor tool designs which were not approved by Lockheed.

K.    **Lockheed Paid Unreasonable Amounts to Vendors and Submitted Claims to the United States for those Amounts**

372.    Regardless of whether vendor tooling was defective, Lockheed allowed vendors to increase the price of their tooling work without justification.

373.    Upon information and belief, Lockheed paid amounts to its vendors which were not reasonable under the circumstances and submitted false claims to the United States for payment of the entire unreasonable amount.

374.    Purchase orders demonstrate that after Lockheed issued purchase orders to Tucker Technology for work to a particular tool, Tucker significantly increased the price it charged Lockheed for that work.

375.    Nevertheless, Lockheed paid Tucker the increased amount for the tools. Upon information and belief, Lockheed submitted false claims for payment to the

United States for this increased amount. Tools subject to this scheme include the following:

| Tool Number | Initial Price | Initial P.O. Number | Final Price | Final P.O. Number |
|---|---|---|---|---|
| 5HW02106-901-MEL | $4,900 | AT85675 | $13,715 | RT85675 |
| 5HW02106-901-MEL-2 | $4,900 | AV01142 | $13,715 | RV01142 |
| 5HW02106-901-MED-2 | $3,800 | AV01140 | $10,570 | RV01140 |
| 5HW02106-902-MED | $3,800 | AT85678 | $14,020 | RT85678 |
| 5HW02106-902-MEL-2 | $4,900 | AV01143 | $13,715 | RV01143 |

## L. Lockheed's Schemes to Make Evidence More Difficult to Obtain.

376. Lockheed made effective tracking of the areas of overcharging identified herein extremely difficult, if not impossible.

377. In addition to discarding the file cabinets containing TISOCs, as alleged above, Lockheed has at least since 1999 begun to divide its tooling documents and store them in different locations in an effort to further obscure its improper charges. For example, Lockheed's Master Records Department at its Marietta, Georgia facility had, in the past, housed all documents relating to any work completed on any particular F-22 or C-130J. Lockheed has now begun to ship those documents to different storage facilities, include several locations operated by Iron Mountain storage.

378. By segregating its tooling documents, Lockheed fully intended that anyone interested in discovering the overcharging alleged above would have a more difficult time in gathering and organizing the relevant documents. More specifically, Lockheed fully intended that individuals like the Relators would be unable learn, among other things, the exact tool numbers regarding which Lockheed has overcharged the Government.

379.    In addition, Lockheed "sunsetted" some of its computer databases relating to its tooling activities.  As part of this "sunset" project, Lockheed completely phased out and then shut down permanently its Unisys computer system in or about the Fall of 2003.  By reconfiguring its computer repositories, Lockheed has made detection of the above overcharging more difficult, if not impossible.

380.    For example, Lockheed keeps track of the work performed by its personnel through a series of labor charge numbers.  Prior to the sunsetting of the Unisys system, it was possible to determine the individuals performing certain tooling work and the specific TOS to which certain work was billed.  However, as a result of internal changes at Lockheed, it has become more difficult to obtain this information, and Lockheed has been able to impede investigation into its overcharging schemes.

## M.    Lockheed Management Was Aware of these Practices But Knowingly and Deliberately Took No Action to End Them.

381.    On or about November 24, 1999, Mr. Dennis Puett, a Tool Inspector, called the office of Tom Burbage, then president of LMAS, to set up a meeting to discuss concerns about fraud with respect to F-22 tooling.  In response, someone named Wilma Walker, purporting to act on behalf of Mr. Burbage, emailed Luther Hudson about Mr. Puett's concerns.  Despite a purported "open door" policy at Lockheed, Mr. Hudson responded that a meeting with Mr. Burbage was not necessary.

382.    Similarly, Tom Burbage himself closed the "open door" in response to concerns raised by Tool Inspector Michael P. Jackson.  Mr. Jackson sent a handwritten memorandum to Mr. Burbage enumerating several concerns.  Among Mr. Jackson's concerns were:  1)  Whether any analysis was completed before Lockheed decided to have outside vendors produce tools, 2)  The poor quality of vendor tools and whether vendors are paid for rework performed on their tools, 3)  Improper inspections at vendor locations, 4)  Higher costs associated with additional Tool Rejections due to

the elimination of Tool Try, 5) Stamping of reference on scribe lines, 6) Ineffectiveness of Six Sigma, and 7) Aircraft produced with nonconforming material.

383. Mr. Burbage responded with a letter dated December 23, 1999. Despite the serious concerns raised by Mr. Jackson, Burbage's response wholly failed to address the substance of those concerns but instead chastised Mr. Jackson for not being a team player. Burbage states that Jackson's concerns are "very offensive" and concludes by giving Mr. Jackson an ultimatum: "You have three choices now: you can get on board with me and help change the way we do things, you can wallow in your misconceptions and be left behind; or you can get out and make room for someone who wants to help build a great company."

384. After repeated and consistent requests to meet with Mr. Burbage, several Tool Inspectors finally did meet with Burbage in or about early 2000. Relators Harrison and Moss were present at this meeting.

385. During the meeting, Tool Inspectors provided several TISOCs to Mr. Burbage illustrating improperly approved nonconforming tools. The Tool Inspectors discussed their concerns about the elimination of Tool Try, the nonconforming tooling produced by the outside vendors, the concern for the safety of the pilots of the aircraft, and the specific problems in the sample TISOCs. Mr. Burbage claimed that he would follow-up with the Tool Inspectors, but his attitude during the meeting was hostile. In fact, Burbage told the Tool Inspectors that they needed to get on the team or get out. Burbage never responded back to the Tool Inspectors, and the Tool Inspectors never saw the sample TISOCs again. Mr. Burbage has since left the Marietta facility to lead the Joint Strike Fighter project in Ft. Worth, Texas.

## VI.   CLAIMS FOR RELIEF.

### COUNT I

### FALSE CLAIMS ACT VIOLATIONS
### UNDER 31 U.S.C. § 3729(a)(1) and (a)(2)

386.   Relators reallege and incorporate by reference each of the
allegations in the preceding paragraphs as though fully set forth below.

387.   Defendant Lockheed knowingly and falsely represented to the
Government that it was in full conformance with the terms of its Government contracts
in order to obtain payments pursuant to the contracts between the Government and
Lockheed, in violation of 31 U.S.C. §3729(a)(1) and (a)(2).

388.   Defendants Lockheed, Aircraft Engineering Corporation, Hyde
Group Limited, Westpark Industries, Inc./Aerobotics Engineering, C. A. Spalding
Company, Tucker Technology, West Cobb Engineering, Votaw, and Summit, by and
through their officers, agents, employees, or subcontractors, knowingly presented or
caused to be presented to an officer or employee of the United States Government false
or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

389.   Defendants Lockheed, Aircraft Engineering Corporation, Hyde
Group Limited, Westpark Industries, Inc./Aerobotics Engineering, C. A. Spalding
Company, Tucker Technology, West Cobb Engineering, Votaw, and Summit, by and
through their officers, agents, employees or subcontractors, knowingly made, used, or
caused to be made or used, false records or statements to get false or fraudulent claims
paid or approved pursuant to contracts and/or subcontracts with the United States
Government in violation of 31 U.S.C. § 3729(a)(2).

390.   Based upon Lockheed's submission of false claims for payment
certifying compliance with the contracts and/or subcontracts, Defendants Lockheed,
Aircraft Engineering Corporation, Hyde Group Limited, Westpark Industries,
Inc./Aerobotics Engineering, C. A. Spalding Company, Tucker Technology, West Cobb

Engineering, Votaw, and Summit directly or indirectly obtained payment from the United States Government.

391. Defendants Lockheed, Aircraft Engineering Corporation, Hyde Group Limited, Westpark Industries, Inc./Aerobotics Engineering, C. A. Spalding Company, Tucker Technology, West Cobb Engineering, Votaw, and Summit, by and through their officers, agents, employees, or subcontractors ordered, authorized, and ratified the actions of their various officers, agents, employees, or subcontractors to take the actions set forth above.

392. Defendants Lockheed, Aircraft Engineering Corporation, Hyde Group Limited, Westpark Industries, Inc./Aerobotics Engineering, C. A. Spalding Company, Tucker Technology, West Cobb Engineering, Votaw, and Summit knowingly violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b).

393. The United States Government has been damaged as a result of Defendants Lockheed, Aircraft Engineering Corporation, Hyde Group Limited, Westpark Industries, Inc./Aerobotics Engineering, C. A. Spalding Company, Tucker Technology, West Cobb Engineering, Votaw, and Summit's conduct in violation of the False Claims Act in an amount to be determined at trial.

## COUNT II
## FALSE CLAIMS ACT CONSPIRACY
## IN VIOLATION OF 31 U.S.C. 3729(a)(3)

394. The allegations contained in the preceding paragraphs are realleged as if fully set forth below.

395. In the factual allegations set forth above, defendants Lockheed, Aircraft Engineering Corporation, Hyde Group Limited, Westpark Industries, Inc./Aerobotics Engineering, C.A. Spalding Company, Tucker Technology, West Cobb Engineering, Votaw, and Summit, by and through their officers, agents, and employees,

conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid in violation of 31 U.S.C. §3729(a)(3).

396. Defendants, by and through their officers, agents, and employees, authorized their various officers, agents, and employees to take the actions set forth above.

397. As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. §§3729(a)(3) and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

## COUNT III
## RETALIATION AGAINST RELATOR DONALD HOWARD
## IN VIOLATION OF 31 U.S.C. § 3730(h)

398. The allegations of the preceding paragraphs are realleged as if fully set

forth below.

399. Since January 1992, Relator Howard repeatedly questioned Lockheed's improper billing on Government contracts.

400. Defendant Lockheed retaliated against Relator Howard for his repeated complaints about Lockheeds improper billing to the Government and his efforts to rectify this situation.

401. In or about October 1998, Defendant Lockheed threatened to terminate Relator Howard.

402. Relator Howard was discriminated against in the terms and conditions of his employment by Defendant Lockheed, by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the False Claims Act.

403. Because of Lockheed's actions, Relator Howard was denied the benefit of working for an honest business, experienced the embarrassment of working

for a company that cheated the Government, and suffered stress, anxiety, and mental anguish.

404.   Defendant Lockheed's actions have damaged Relator Howard in violation of 31 U.S.C. §3730(h).  Relator Howard has been damaged in an amount to be determined at trial as a result of Lockheed's actions.

405.   Pursuant to 31 U.S.C. § 3730(h), Relator Howard is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of this retaliation claim.

**COUNT IV**
**RETALIATION AGAINST RELATOR LARRY WILSON**

**IN VIOLATION OF 31 U.S.C. § 3730(h)**

406.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

407.   Since May 1994, Relator Wilson has repeatedly questioned Lockheed's improper billing on Government contracts.

408.   Defendant Lockheed retaliated against Relator Wilson for his repeated complaints about Lockheed's improper billing to the Government and his efforts to rectify this situation.

409.   In or about October 1998, Defendant Lockheed threatened to terminate Relator Wilson.

410.   Relator Wilson was discriminated against in the terms and conditions of his employment by Defendant Lockheed by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the False Claims Act.

411.   Because of Lockheed's actions, Relator Wilson was denied the benefit of working for an honest business, experienced the embarrassment of working

for a company that cheated the Government, and suffered stress, anxiety, and mental anguish.

412.    Defendant Lockheed's actions have damaged Relator Wilson in violation of 31 U.S.C. § 3730(h).  Relator Wilson has been damaged in an amount to be determined at trial as a result of Lockheed's actions in this regard.

413.    Pursuant to 31 U.S.C. § 3730(h), Relator Wilson is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of this retaliation claim.

## PRAYER

WHEREFORE, on Counts I and II, Relators, on behalf of themselves and the United States Government pray:

(a)    That this Court enter judgment against the Defendants jointly and severally in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each action in violation of 31 U.S.C. §3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

(b)    That Relators be awarded all costs, attorneys' fees, and litigation expenses;

(c)    That in the event that the United States Government continues to proceed with this action, Relators be awarded for bringing this action 25% of the proceeds of the action or settlement of any such claim;

(d)    That in the event that the United States Government does not proceed with this action, Relators be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall be 30% of the proceeds of this action or the settlement of any such claim;

(e)    That the United States Government and Relators receive all relief, both at law and in equity, to which they may reasonably appear entitled.

On Counts III and IV, Relators Howard and Wilson pray:

- 96 -

(a)    That they be awarded all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, to which they are entitled pursuant to 31 U.S.C. § 3730(h) and other applicable law;

(b)    That they be awarded all litigation costs and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h) and other applicable law;

(c)    That they receive all relief, both at law and in equity, to which they may reasonably appear entitled.

Respectfully submitted,

Frederick M. Morgan, Jr. (0027684)
Jennifer M. Verkamp (0067198)
Janet Larkin (0073610)
Volkema, Thomas, Miller,
Burkett, Scott & Merry, LPA
700 Walnut St., Suite 400
Cincinnati, Ohio  45202
Tel. (513) 651-4400
e-mail  rmorgan@vt-law.com
            jverkamp@vt-law.com
            jlarkin@vt-law.com

Mike Bothwell (069920)
BOTHWELL & SIMPSON, P.C.
304 Macy Drive
Roswell, GA 30076
Tel. (770) 643-1606
e-mail  Mike@bothwelllaw.com

Stephen T. La Briola (Ga. Bar No. 431026)
Kevin P. Weimer (Ga. Bar No. 745979)
FELLOWS, JOHNSON & LA BRIOLA, LLP
Peachtree Center
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, GA 30303-1731
Tel. (404) 586-9200
e-mail  slabriola@fjl-law.com

kweimer@fjl-law.com

(Motions for admission pro hac vice pending)