IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, *ex rel.* Donald E. Howard, *et al.*, | : : : | Chief Judge Susan J. Dlott |
| Plaintiffs and Relators, | : : | Case No. 1:99-cv-285 |
| v. | : : | Order Denying without Prejudice to Renewal Motions in Limine to Exclude |
| Lockheed Martin Corporation, | : : | Relators' Expert Witnesses |
| Defendant. | : | |

This matter is before the Court on Defendant's Motions in Limine to Exclude Relators' Expert Witnesses (Docs. 251, 252, 253, and 254). Defendant Lockheed Martin Corporation moves to exclude testimony from Relators' purported expert witnesses: Charles R. Henry, William A. Stimson, Shermon E. Roberts, and Clarence Edward Brooks, Jr. For the reasons that follow, the Court will **DENY WITHOUT PREJUDICE TO RENEWAL** the Motions in Limine.

I.     **LEGAL STANDARDS GOVERNING MOTIONS IN LIMINE**

District courts have authority to adjudicate motions in limine pursuant to their "inherent authority to manage the course of trials." *Luce v. United States.*, 469 U.S. 38, 41 n.4 (1984). Courts should exclude evidence in limine "only when evidence is clearly inadmissible on all potential grounds." *Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 706 (E.D. Ky. 2010) (citation omitted). The Sixth Circuit has stated that the "better practice" is to address questions regarding the admissibility of broad categories of evidence "as they arise." *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975). "[A] court is almost always better situated during the actual trial to assess the value and utility of evidence." *Owner-Operator Independent Drivers Ass'n v. Comerica Bank*, No. 05–CV–0056, 2011 WL 4625359,

at *1 (S.D. Ohio Oct. 3, 2011). Denial of a motion in limine does not necessarily mean that the evidence, which is the subject of the motion, will be admissible at trial. *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

This rationale applies to motions in limine to exclude expert witness testimony. "A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance." *Jahn v. Equine Servs., PSC,* 233 F.3d 382, 393 (6th Cir. 2000) (overturning an order granting summary judgment because the district court prematurely decided to exclude expert testimony). "'[I]n all but the most clear cut cases,' it will be difficult for a court to adequately gauge the reliability of an expert's testimony based on the 'truncated record' available at summary judgment." *Davis v. United States*, No. 08-184-ART, 2012 WL 424887, at *6 (E.D. Ky. Feb. 9, 2012) (quoting *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 188 (1st Cir. 1997)).

## II. RELEVANT FEDERAL RULES OF EVIDENCE

### A. Rule 702 of the Federal Rules of Evidence

Rule 702 of the Federal Rules of Evidence addresses the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)). The district court acts as a "gatekeeper" in making these determinations and must evaluate relevancy and reliability with "heightened care." *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (citation omitted). The district court must perform its gatekeeper function before the testimony can be admitted regardless of whether the testimony is based on scientific knowledge, technical knowledge, or other specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 147–49 (1999); *see also Mike's Train House v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006).

As to reliability, the Supreme Court in *Daubert* identified several factors which might bear on a reliability determination: testing, peer review, publication, known or potential rate of error, and general acceptance. 509 U.S. at 593–94. The *Daubert* factors are neither definitive nor exhaustive and may not apply in every case. *Mike's Train House*, 472 F.3d at 407. "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid*, 676 F.3d at 527. However, an evaluation of the reliability of an expert opinion does not involve a determination of whether the opinion is correct. *In re Scrap Metal Antitrust Lit.*, 527 F.3d 517, 529–30 (6th Cir. 2008); *GED Integrated Solutions, Inc. v. Durotech Int'l, Inc.*, No. 5:06CV1327, 2009 WL 233872, at *4 (N.D. Ohio Jan. 30, 2009) (citing *In re Scrap Metal*).

In certain cases, an expert's experience alone may provide a reliable basis for his testimony. Fed. R. Evid. 702 (2000 Amendments advisory committee notes); *see also Campbell v. City of Springboro, Ohio*, 788 F. Supp. 2d 637, 662 (S.D. Ohio 2011) (stating that reliability concerns may focus on personal knowledge and experience). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 (2000 Amendments advisory committee notes); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 (6th Cir. 2007) (quoting the advisory committee notes).

Rule 702 "does not require anything approaching absolute certainty." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010). However, an expert's opinion must amount to more than mere speculation. *Id.* The Sixth Circuit has excluded an expert's opinion when it was based upon a "string" of speculations:

> And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line. Yet, so long as there is a line, some forms of testimony may cross it, and that happened here. [The expert's] opinion contains not just one speculation but a string of them: A suggests by analogy the possibility of B, which might also apply to C, which, if we speculate about D, could eventually trigger E, so perhaps that happened here. At some point, the train becomes too long to pull and the couplings too weak to hold the cars together.

*Id.* at 672 (internal citation omitted).

Courts have struggled to draw the line between expert testimony that should be excluded because it is unreliable and testimony that should be admitted despite weakness in its factual bases. The Sixth Circuit has instructed as follows:

> [A]n expert's opinion . . . should be supported by good grounds, based on what is known. The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. An expert's

4

> opinion, where based on assumed facts, must find some support for those assumptions in the record. However, *mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility*.

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000) (internal quotations and citations omitted) (emphasis added); *see also In re Gen. Motors OnStar Lit.*, No. 2:-CV-DT, 2011 WL 679510, at *8 (E.D. Mich. Jan. 12, 2011) (stating that an expert's failure to consider all available material goes to the weight of the expert's testimony), *report and recommendations adopted by*, No. 2:07-MDL-01867, 2011 WL 674727 (E.D. Mich. Feb. 16, 2011). "An expert need not consider every possible factor to render a 'reliable opinion;' rather the expert need only consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court." *In re Gen. Motors OnStar Lit.*, 2011 WL 679510, at *8 (internal citation and quotation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

**B.     Rule 403 of the Federal Rules of Evidence**

Also, Rule 403 of the Federal Rules of Evidence permits relevant evidence to be excluded if it is prejudicial:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. "Like all evidence, the admissibility of expert testimony is also subject to a . . . balancing of probative value against likely prejudice under Rule 403." *United States v. Geiger*, 303 F. App'x 327, 329 (6th Cir. 2008). The Supreme Court has recognized that expert testimony can "be both powerful and quite misleading because of the difficulty in evaluating it"

so the district court in weighing probative value versus prejudicial effect should "exercise[] more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quotation and citation omitted).

### III. ANALYSIS

#### A. Motion to Exclude Testimony from Relators' Expert Clarence Edward Brooks, Jr. (Doc. 254)

Clarence Edward Brooks, Jr. is a former auditor with thirty years of auditing experience, including twenty-five years with the Defense Contract Audit Agency. He submitted an expert report dated May 4, 2011 and gave opinions as to the adequacy of the so-called "Elliot Method" to trace tooling labor and vending costs through Lockheed's accounting and billing systems. (Doc. 226-10 at PageID 9029.) Brooks expressly stated that he did not consider or give an opinion regarding the broader subject of Lockheed's accounting and billing systems in general. (*Id.*)

Relators relied on the Brooks expert report to support a Motion to Compel seeking that Lockheed be required to produce additional discovery regarding the tool-tracing process. (Doc. 209.) The Court granted the Motion to Compel in part on a limited basis, but denied it insofar as Relators sought discovery sanctions against Lockheed. (Doc. 242.) The Court, in adjudicating the Motion to Compel, specifically declined to address the "the elements of Relators' claims, the merits of those claims, and the calculation of damages, if any." (Doc. 242 at PageID 9496.) Relators assert that they will rely on Brooks's testimony to help establish that Lockheed's tool-tracing process has interfered with Relators' ability to calculate damages and to identify specific false claims. (Doc. 260 at PageID 11184.)

The Court finds that it would be premature to determine the relevance, probative value, and potential prejudicial effect of the Brooks's testimony at this point. The Court notes that

6

Brooks, and all the expert witnesses, will not be permitted to offer expert testimony beyond the opinions stated in their expert reports consistent with Federal Rule of Civil Procedure 26(a)(2)(B)(i) & (D). Rule 26(a)(2)(B)(i) requires the expert to provide a "complete statement of all opinions" and Rule 26(a)(2)(D) requires that the parties make expert disclosures in the time and sequence mandated by the Court.

**B.      Motion to Exclude Testimony From Relators' Expert Charles R. Henry, William A. Stimson, and Shermon E. Roberts (Docs. 251, 252, and 253)**

The Motions to Exclude the testimony of Relators' three other proposed expert witnesses raise overlapping issues, and therefore, will be addressed together.

**1.      Summary of the Purported Experts' Qualifications and Opinions**

Charles R. Henry, Major General (U.S. Army, Ret.), spent thirty-two years in the Army, including nineteen years in procurement/acquisition. Relators offer him as an expert possessing specialized knowledge regarding government procurement. (Doc. 251-1 at PageID 9620.) Gen. Henry submitted an expert report on May 9, 2011 regarding Lockheed's quality assurance (sometimes referred to herein as "QA") obligations under its contracts and the alleged failure of Lockheed's quality assurance systems.

Gen. Henry made a number of findings in his report. He stated that in the procurement process the Government buys both the end product and "the capability to use those items reliably . . . , to support them as necessary, and even to restart production if necessary." (Doc. 251-1 at PageID 9624.) Elsewhere, he opined that the Government contracted for the capacity to build and maintain the F-22 aircraft. (Doc. 251-1 at PageID 9628–29.) Gen. Henry did not cite specific contract provisions in stating this opinion. He also reviewed Lockheed documents which he asserted established that the Lockheed quality assurance systems were insufficient. He concluded, in part, that "[t]he failure of Lockheed to follow quality requirements gives no

assurances that future use of the manufacturing process will produce conforming F-22s (or that DOD can reliably sustain the fleet without expending considerable resources), and as a result, the Air Force did not get what it paid for." (Doc. 251-1 at PageID 9634.)

Relators offer William A. Stimson, Ph.D., as an expert with specialized knowledge in the field of quality engineering systems. He held a civilian position in quality assurance with the Navy and then, after he retired, he obtained a doctorate in systems engineering from the University of Virginia. (Doc. 252-1 at PageID 9704.) Additionally, he has authored books on quality assurance standard ISO-9001. (*Id.* at PageID 9743.) He completed an expert report for Relators dated April 26, 2011 and a supplemental report dated August 22, 2011. (Doc. 252-1; Doc. 261-10.)

In his report, Dr. Stimson identified and quoted from quality standards applicable to the F-22 including the MIL-Q-9858A, ISO 9001:1994, ISO 9001:2000, AS9100, and AS9100A/B. (Doc. 252-1 at PageID 9710–12.) He also identified Lockheed's own quality systems provisions governing tooling including EMD QA Plan (October 30, 1991) and the Lockheed QA Manual, Tool and Gage (Revision April 30, 1996). (Doc. 252-1 at PageID 9712–13.) Dr. Stimson reached three primary conclusions: (1) there was a "near continuum of failure of the tool management system" which resulted in a population of products "subject to unbounded variation in the quality characteristics" such as uniformity, accuracy, interchangeability, and quality; (2) "the product population of a nonconforming system is itself nonconforming;" and (3) Lockheed's inability to provide the costs of quality to the government over the period of contract performance is a systemic failure of the quality management system in violation of MIL-Q-9858A and ISO-9001 (known as AS9100 in the aerospace industry). (Doc. 252-1 at 9741–42.)

Finally, Relators offer Shermon E. Roberts as an expert with specialized knowledge regarding quality engineering systems. Roberts retired from his position as a civilian employee of the United States Army Missile Command in 1988. (Doc. 253-1 at PageID 9885.) He then worked for government contractors. (*Id.*) Roberts asserted that his positions provided him experience in the technical disciplines of "configuration management" and "quality assurance." (*Id.*) He completed an expert report dated May 9, 2011. (*Id.* at PageID 9884.)

In his written report, Roberts identified the relevant contract documents stating as follows:

> The prime contracts applicable to this case are Contract No. F33657-91-C-0006, referred to as the "EMD" contract, and production contracts. The initial quality specifications for the F-22 Program invoked in the EMD contract were MIL-Q-9858A (tailored), *Quality Program Requirements*; MIL-STD-1520C (tailored), *Corrective Action and Disposition System for Nonconforming Material*; and MIL-STD-1535A (tailored). These specifications were superseded by the ISO series of documents in 1996. Additional quality requirements were included in the EMD Statement of Work and in FAR 52.246-3.

(Doc. 253-1 at PageID 9886.) Roberts stated that the "quality specifications applicable to the F-22 Program (MIL-Q-9858A, MIL-STD-1520C, ISO 9001, and AS9011) included requirements for the design, verification, documentation, and control of special tooling." (*Id.*)

After setting forth the contract requirements, Roberts stated multiple findings and opinions. The findings were based on his review of the depositions and Lockheed documents, including memoranda, letters, emails, and reports. He stated in relevant part:

> One of the fundamental, overarching purposes of any quality assurance program is to provide assurances to the customer that outputs conform to all requirements. A properly functioning QA program will provide such assurance, while a defective one cannot. Thus, a properly functioning QA program satisfies two interrelated but separately important objectives: it creates outputs that meet requirements, and assures the customer that outputs meet requirements. These dual objectives cannot be de-linked, nor can one be overlooked. *Any QA program, no matter how ineffective, can produce outputs that meet specifications, but no QA program that is ineffective can assure the customer that any of the*

9

> *outputs do so.  Because of the latter truism, all of the outputs of an ineffective QA program necessarily are nonconforming.*

(Doc. 253-1 at PageID 9906 (emphasis added).)  He further stated that because, of "on-going failures in the F-22 QA Program," the Air Force could not "have confidence that what they purchased—finished F-22's and the tools to build more—[would] perform as intended."  (*Id.* at PageID 9907.)  Roberts concluded that "every output of this ineffective system was nonconforming."  (*Id.*)

### 2. Analysis

The Court will not exclude the purported expert testimony of Charles Henry, Shermon Roberts, and William Stimson at this time.  Relators cite to portions of the experts' testimony to support their summary judgment briefing, but their testimony is not dispositive on any summary judgment issue.  The Court will be better able to assess the reliability of the expert testimony in context of a complete evidentiary foundation during trial.  *See Davis*, 2012 WL 424887, at *6 (stating it is difficult to gauge reliability on a truncated record); *Comerica Bank*, 2011 WL 4625359, at *1 (stating that the court is usually able to better assess value and utility of evidence at trial).  However, the Court can offer preliminary thoughts to guide later arguments if Lockheed renews its motions to exclude the experts' testimony.

#### a. Reliability Generally

Lockheed does not challenge the qualifications of Gen. Henry, Dr. Stimson, or Mr. Roberts.  Instead, Lockheed seeks to exclude their testimony on the grounds that the testimony is unreliable.  Lockheed summarizes the experts' opinions as being that "bad tooling makes bad parts," then criticizes those opinions as unreliable.  First, it faults Relators' experts for failing to identify any specific bad tools or bad parts.  The experts admitted that they lacked specific knowledge about bad parts on the F-22s.  (Henry Dep. 87, Doc. 251-2 at PageID 9675;

Stimson Dep. 183–84, Doc. 252-2 at PageID 9820; Roberts Dep. 67–68, Doc. 253-2 at PageID 9935.)  Likewise, the experts did not offer statistical analysis or evidence to support their broad statements that statistics support the conclusion that bad tooling created bad parts.  (Stimson Dep. 183–84, Doc. 252-2 at PageID 9820; Roberts Dep. 68–69, 253-2 at PageID 9935.)

Next, Lockheed criticizes the experts' methodology and evidentiary bases.  Lockheed faults the experts for relying on only a set of documents hand-picked by Relators' attorneys and for not conducting any onsite testing or product measurements.  Lockheed questions why the experts did not review available NMDs (nonconforming material documents) or quality assurance reports where the cause code was related to tooling.  Lockheed contends that the experts could have used these documents to try to tie the production of bad parts to bad tooling caused by vendor error.  Lockheed further posits that the internal Lockheed documents that discuss nonconforming tools are not evidence that the Lockheed quality assurance system was deficient.  Rather, Lockheed contends that the documents suggest the quality assurance system worked by identifying nonconforming tools and preventing bad parts from being installed on the F-22s.

In general, Lockheed's criticisms of the factual foundations for the experts' opinions bear more on the weight of the evidence than its admissibility.  The experts identified documents produced in discovery to support their opinion that deficiencies existed in the quality assurance system generally, and in tooling specifically.  The experts cited a variety of Lockheed internal inspection reports, internal audits, quality alerts, and emails.  They pointed out that the Air Force's quality assurance manager for the F-22, Terry Freeman, testified that quality assurance requirements applied to tooling and that "you don't get good parts off bad tooling."  (Freeman Dep. 33, Doc. 261-7 at PageID 11494.)

However, the experts will not be permitted to baldly assert that statistics justify their opinions without providing a factual basis for that assertion. If the experts purport to rely on their own experience, they need to explain how their experience relates to the facts at hand and leads to the conclusion reached. *See* Fed. R. Evid. 702 (2000 Amendments advisory committee notes). "[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." *Id.* Rule 702 recognizes that it is a "venerable practice" to use "expert testimony to educate the factfinder on general principles." *Id.*

Lockheed will be given latitude at trial, assuming the case goes to trial, to subject the factual bases for the experts' opinions to vigorous cross-examination. *See Daubert*, 509 U.S. at 595.

      **b.**    **Other Issues**

To begin, the experts will be permitted to testify regarding only their specific areas of expertise. The experts can testify on areas within their expertise based on hypothetical facts. "The language 'facts or data' [in Rule 702(b)] is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." Fed. R. of Evid. 702 (2000 Amendments advisory committee notes); *see also McLean*, 224 F.3d at 801 (stating that assumed facts must find support in the record); *Melton v. O.F. Shearer & Sons, Inc.*, 436 F.2d 22, 27–28 (6th Cir. 1970) (same).

Lockheed criticizes Gen. Henry for citing to the expert report of Dr. Stimson. (Doc. 251-1 at PageID 9633.) Lockheed argues that Dr. Stimson's report does not qualify as sufficient facts or data under Rule 702 to support Gen. Henry's expert opinion. However, Lockheed's argument is contradicted by the advisory committee note to Rule 702 which states that the term "data" is

"intended to encompass the reliable opinion of other experts." Fed. R. of Evid. 702 (2000 Amendments advisory committee notes). In *Auto Indus. Supplier ESOP v. Ford Motor Co.*, 435 F. App'x 430 (6th Cir. 2011), the court excluded the first expert's testimony because he relied on a second expert's summaries of data without personally verifying or analyzing the underlying data. *Id.* at 454–56. The case does not require the Court always to strike an expert's opinion if the expert bases his analyses and conclusions upon the opinion of a second expert's report.

Finally, the Court notes that "[a]bsent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." *N. Am. Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir. 1997) (citation omitted). The experts "may not testify as to the legal effect of a contract." *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 301 (6th Cir. 1998) (citation omitted). Similarly, the experts generally may not testify as to the interpretation of federal regulations. *See Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003); *CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 656 (E.D. Mich. 2000). Relatedly, the experts cannot testify as to whether Lockheed's conduct conformed to the requirements of a contract, quality standard, or regulation that they have not read or with which they are not otherwise familiar because such an opinion would not be based on sufficient facts or data under Rule 702(b).

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motions in Limine to Exclude Relators' Expert Witnesses (Docs. 251, 252, 253, and 254) hereby are **DENIED WITHOUT PREJUDICE TO RENEWAL**.

IT IS SO ORDERED.

        S/Susan J. Dlott_____
        Chief Judge Susan J. Dlott
        United States District Court